**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| *AUNDREA E. MATHIS,* **TDCJ-ID#583934,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:05-CV-0523** |
| | § | |
| *WARDEN STEVENSON, et al.,* | § | |
| **Defendant.** | § | |

**DEFENDANT EILEEN KENNEDY'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

**TO THE HONORABLE JUDGE OF THIS COURT:**

NOW COMES Defendant, Eileen Kennedy, by and through the Office of the Attorney General of Texas, to submit this her Motion For Summary Judgment And Brief In Support.  In support thereof, Defendant respectfully offers the following:

**I.**
**STATEMENT OF THE CASE**

Plaintiff Aundrea E. Mathis, TDCJ-ID# 583934, is a prisoner presently housed in the Texas Department of Criminal Justice-Institutions Division, Coffield Unit, in Tennessee Colony, Texas. During the time of the subject events, Plaintiff was housed at the McConnell Unit in Beeville, Texas. Litigating *pro se* and *in forma pauperis*, he brings the instant lawsuit pursuant to 42 U.S.C. §1983 for an alleged violation of his constitutional rights.

Plaintiff filed this §1983 action alleging that multiple Defendants denied him his rights under the Eighth Amendment to the United States Constitution in that they allegedly failed to protect him from harm from other inmates.  Specifically, Plaintiff Mathis contends that the Defendants failed to protect him from assault by Offender Anthony Hampton, TDCJ-ID# 668364, on March 19, 2004. On April 18, 2006, the Magistrate Judge issued a Memorandum And Recommendation

recommending that all but one defendant be dismissed, which was also adopted by the District Judge.

On that same date, the Magistrate Judge ordered Defendant Kennedy to answer. Defendant Kennedy filed her Original Answer on May 22, 2006, and asserted her entitlement to Eleventh Amendment and qualified immunities. Within the Order For Service Of Process, the Magistrate Judge requested that Defendant file her Motion For Summary Judgment within 120 business days after the answer is due. Defendant Kennedy now moves for summary judgment.

## II.
## MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(b), Defendant Eileen Kennedy moves this Court to grant summary judgment in her favor, as there are no genuine issues of material fact for trial. In support of her motion, Defendant attaches the following as summary judgment evidence:

A.    **Documentary Evidence**

**Exhibit A**:    Extract, Classification Records of Offender Aundrea E. Mathis, TDCJ-ID# 583934, with business record affidavit; *redacted*;

**Exhibit B**:    Extract, Emergency Action Records of Aundrea E. Mathis, TDCJ-ID# 583934, with business record affidavit; *redacted;*

**Exhibit C**:    Extract, Grievance Records of Offender Aundrea E. Mathis, TDCJ-ID# 583934, with business record affidavit; *redacted*;

**Exhibit D**:    Extract, Texas Department of Criminal Justice, Classification Plan;[1]

**Exhibit E**:    Extract, Texas Department of Criminal Justice, Safe Prisons Plan;[2].

---

[1] Counsel will supplement with supporting business records affidavit at a later date.

[2] *Id.*

**B.    Affidavits**

    **Exhibit F:**    **Eileen Kennedy**    Warden, Daniel Unit, TDCJ, Snyder, Texas; and

    **Exhibit G:**    **Randy Minter**    Chief of Classification, Coffield Unit, TDCJ, Tennessee Colony, Texas.[3]

## III.
## UNDISPUTED FACTS

1.    At all times relevant to the instant litigation, Plaintiff was an inmate assigned to the TDCJ-ID.

2.    At all times relevant to the instant litigation, Defendant Kennedy was employed as an Assistant Warden for the TDCJ-ID McConnell Unit.

3.    Plaintiff was assigned to the McConnell Unit at all times relevant to the instant litigation.[4]

4.    On or about August 2, 2004, Barbara Cormier, of the TDCJ-ID Ombudsman Office was contacted by Alvin Mathis, Plaintiff's brother, with concerns for Plaintiff's safety.[5]

5.    An Offender Protection Investigation can be initiated by anyone who has knowledge that an offender may be in need of protection. Such knowledge can come from the offender having the problem, the offender's family, TDCJ staff, or others. TDCJ staff members are required to notify the Chief of Unit Classification and the Major or the ranking security officer.[6]

6.    On or about August 2, 2004, Barbara Cormier requested that Williams Stephens, Warden, McConnell Unit, conduct an investigation into Plaintiff's alleged life endangerment claim.[7]

--------------------------------

[3] Defendant will timely supplement with a signed affidavit upon receipt.

[4] Exhibit A, pg. 1

[5] *Id.,* at pg. 2.

[6] Exhibit E, pg. 2-3

[7] Exhibit A, pg. 2

7.     On or about August 2, 2004, Lt. Jennifer Quintana was assigned to conduct a "life in danger" investigation by DC.[8]

8.     On or about August 2, 2004, Lt. Quintana conducted a "life in danger" investigation.[9]

9.     Plaintiff's classification records indicate that when he was interviewed on August 2, 2004, by Lt. Quintana, Plaintiff stated that his life is not in danger; that no offenders had threatened to impose harm to him, and that what he wanted was a job change.[10]

10.    On or about August 2, 2004, Plaintiff signed a waiver of his "life in danger" concerns during Lt. Quintana's investigation.[11]

11.    On or about August 2, 2004, Plaintiff signed a witness statement that he does not feel safe on 7 building because he would have to choose a gang affiliation.[12]

12.    On or about August 2, 2004, Lt. Quintana noted that Plaintiff denied being a member of any "Crips" or "Bloods" that are on his current housing unit, 7 building.[13]

13.    On or about August 2, 2004, Lt. Quintana noted that Plaintiff has previously admitted to being a "Crip", but had also been associated with the "Bloods." Because of this, Lt. Quintana's determined that the Security Threat Group [hereinafter "STGO"] should be contacted to determine any possible gang affiliation by Plaintiff.[14]

14.    On or about August 9, 2004, Sgt. Gamaliel Olvera of the McConnell Unit STGO noted that Plaintiff was not being monitored by their office and that they had not received any information which may indicate that Plaintiff's safety was at risk.[15]

---

[8] *Id.*, pg. 3

[9] *Id.*, pgs. 4-8

[10] *Id..*, pgs. 4-8

[11] *Id.*, pg. 6.

[12] *Id.*, pg. 8

[13] *Id.*, pg. 6

[13] *Id.*, pgs. 6-7

[15] *Id.*, pg.10

15.   On or about August 10, 2004, the McConnell Unit Classification Committee [hereinafter "UCC"] met to review Plaintiff's "life in danger" claim.[16]

16.   A Unit Classification Committee is made up three individuals: a chairperson and two (2) voting members.  Each voting member has one (1) vote, and the majority vote rules.[17]  No single individual at the unit, including the Assistant Warden, has the authority to change the custodial classification of an offender.  A recommendation to change an offender's classification requires a majority vote by the UCC.[18]  The State Classification Committee [hereinafter "SCC"] in Huntsville is the final approving authority on all recommendations.[19]  This procedure is in compliance with the Safe Prisons Plan and Classification Plan.

17.   On or about August 10, 2004, the McConnell Unit Classification Committee concluded that Plaintiff "signed a waiver & states he is not having problems" and that there was "no evidence to warrant unit transfer."[20]

18.   On or about August 10, 2004, the McConnell Unit Classification Committee reassigned Plaintiff  from the Garden Squad to the Laundry.[21]

19.   When the McConnell Unit Classification Committee met on August 10, 2004, it consisted of Maj. Domingo Carillo, Chairperson,  Jorge Veliz, and Amie Gaitan.[22]

20.   From August 10, 2004, to March 19, 2005, Plaintiff did not submit any I-60 Inmate Correspondence to Officials.[23]

21.   On or about March 19, 2005, at approximately 0420 hours, Plaintiff was assaulted by Offender Anthony Hampton, TDCJ-ID #668364, while in the Eight (8) Dining Hall.[24]

---

[16] *Id.,* pg.11

[17] Exhibit D, pg. 2-3

[18] *Id.,* pg. 3

[19] Exhibit E, pgs. 9-10

[20] Exhibit A, pgs. 11-12

[21] *Id.*, pg. 12

[22] *Id.*, pg. 11

[23] Affidavit, Randy Minter

[24] Exhibit A, pg. 14-23; Exhibit B

22.    On or about March 19, 2005, at approximately 0420 hours, Sgt. Jarrett Hawke Fenner immediately locked the entrance and exit doors to Eight (8) Dining Hall and called for additional staff.[25]

23.    On or about March 19, 2005, at approximately 0420 hours, upon the arrival of additional staff to the Eight (8) Dining Hall, both Offender Hampton and Plaintiff were already separated and were subsequently placed into hand restraints.[26] Offender Hampton, TDCJ-ID# 668364, was found to have a seven and one half inch piece of metal sharpened to a point at one end and wrapped in cloth at the other end in his possession.[27]

24.    On or about March 19, 2005, at approximately 0420 hours, Plaintiff and Offender Hampton, TDCJ-ID# 668364,  were escorted to Ten (10) Building Medical for an evaluation.[28]

25.    Plaintiff's injuries consisted to (1) a ½ inch laceration at the top of his head, (2) 1/4 inch circular wound to the middle of his upper back, (3) 1/8 inch circular laceration noted to his left shin, and (4) 1/8 inch laceration to his inner lip, and was given first aid.[29]

26.    On or about March 19, 2005, Plaintiff was assigned to Pre Hearing Detention Status and given a disciplinary charge for a Level 2 Code 21.0 Fighting without a weapon.[30]

27.    On or about March 19, 2005 at approximately 0445, Defendant was informed of the altercation between Plaintiff and Offender Hampton.[31]

28.    On or about March 19, 2005, Lt. Andres Gallegos initiated a Safe Prisons Investigation on both Offender Hampton and Plaintiff.[32]

---

[25] *Id.*, pg. 18; Exhibit B

[26] *Id*, pgs. 16, 18, 23; Exhibit B

[27] *Id.*, pgs. 14, 18, 19, 23; Exhibit B

[28] *Id.*, pgs. 16, 18, 23, 25-26, 28-29; Exhibit B

[29] *Id.*, pgs., 16, 18, 23, 25-26, 28-29; Exhibit B

[30] *Id.*, pgs. 16-18, 23; Exhibit B

[31] *Id.*, pg. 23; Exhibit B

[32] *Id.*, pgs. 14-23; Exhibit B

29.     On or about March 19, 2005,  Lt. Gallegos took Plaintiff's statement:[33]

30.     On or about March 23, 2005, the McConnell UCC met to review Plaintiff's possible endangerment situation.[34]

31.     When the McConnell UCC met on March 23, 2005, it consisted of Major Bryan Gordy, Chairperson, Amy Cooper, and Cap. Mike Parker.[35]

32.     On or about March 23, 2005, the McConnell UCC  recommended a unit transfer for Plaintiff.  The recommendation was based upon the injuries he sustained and due to the fact that he may be a possible assault target by the Crips.[36]

33.     On or about March 29, 2005, the UCC recommendation was forwarded to the State Classification Committee in Huntsville, Texas.[37]

34.     On or about May 3, 2005, the SCC authorized Plaintiff's transfer from the McConnell Unit to the Coffield Unit.[38]

# IV.
## ISSUES OF LAW

1.     Whether Defendant Kennedy was personally involved in the deliberate indifference claim against her.

2.     Whether Defendant was deliberately indifferent to Plaintiff's safety.   Whether Defendant can be held liable for deliberate indifference absent personal involvement.

3.     Whether Defendant is entitled to Eleventh Amendment Immunity for the claims brought against her in her official capacity.

---

[33]  "Offender Mathis claims he was trying to stop Offender Hampton from fighting another offender. Offender Mathis states his life is not in danger and does not feel threatened by Offender Hampton.  Offender Mathis states he can return to General Population with no problems."

[34] *Id.*, pgs. 11, 13-14

[35] *Id.*, pgs. 11, 13-14

[36] *Id.*, pgs. 11, 13-14

[37] *Id.*, pgs. 11, 13-14, 30

[38] *Id.*, pg. 31

4.    Whether Defendant is entitled to Qualified Immunity on Plaintiff's deliberate indifference claim.

**V.**

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**A.    Summary Judgment Standard**

A summary judgment shall be rendered if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[39]  The rule permits summary judgment even if the parties disagree as to some facts and is precluded under Rule 56c only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine.[40]  Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case."  In the present case, there are not genuine issues of material fact, and Defendant is entitled to judgment as a matter of law.

**B.    Defendant Kennedy was not personally involved in a constitutional deprivation.**

Plaintiffs bringing civil rights claims under  42 U.S.C. §1983 must establish a causal connection between the alleged constitutional deprivation and the defendant whom they would hold responsible; personal involvement is an essential element of a civil rights cause of action.[41]  Further, in an action against individual government defendants, plaintiffs must plead more than conclusory allegations which fail to set forth specific facts showing the basis of their claim.[42]  Thus, plaintiffs

---

[39] FED.R.CIV.P. 56[c]

[40] *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct.2505, 2510 (1986).

[41] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

[42] *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996); *Elliot v. Perez*, 751 F.2d 1472 (5th Cir. 1985).

bringing a civil rights action cannot simply make generalized allegations or assert legal or constitutional conclusions.[43]

The court, in retaining Plaintiff's failure to protect claim against Warden Kennedy, noted the following:

> He claims that six months prior to the attack, he began filing I-60 forms, requesting a transfer, and that she reviewed those requests. Warden Kennedy was present at his LID hearing.  Plaintiff spoke directly to Warden Kennedy about his fears.[44]

A review of the evidence reveals that Defendant Kennedy had no personal involvement in a constitutional violation involving the Plaintiff.

In late July or early August 2004, Barbara Cormier, of the TDCJ-ID Ombudsman Office was contacted by Alvin Mathis, Plaintiff's brother, with concerns for Plaintiff's safety.[45] She wrote to Warden William Stephens, McConnell Unit, the following on August 2, 2004 and requested an investigation, noting:

> The offender claims that his life is in danger due to recently being reassigned to a new work and housing area.  Claims that he is around gang members.  Claims that he does not want any trouble and does not want to participate with any gang membership.  Seeks new housing area.[46]

On or about August 2, 2004, Lt. Jennifer Quintana was assigned to conduct a life endangerment investigation.[47]  On or about that same date, Lt. Quintana interviewed Plaintiff, who stated that:

---

[43] *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).

[44] Memorandum And Recommendation To Dismiss Certain Defendants And To Retain Case, pg.. 7.

[45] Exhibit A, pg. 2

[46] *Id.*, pg. 2

[47] *Id,* pg. 3

"no offenders have threatened to impose harm to him. His complaint is that he was moved from 4 building to seven building and placed in the Hoes Squad #18. ... "Not in danger, but only wants a job change."[48]

Plaintiff then signed an Offender Waiver Statement:

I am requesting that no further action be taken by the McConnell Unit regarding my request for safekeeping, administrative segregation, protective custody, transfer or other recent job change. The situation has been resolved and I no longer require protection/transfer. I understand that the allegations I made which resulted in this investigation will not be investigated again unless there is new evidence that should warrant another investigation.[49]

Lt. Quintana noted, in his report, that Plaintiff had previously admitted to being a "Crip," but also had been associated with the "Bloods." Because of this, Lt. Quintana determined that the Security Threat Group [hereinafter "STG"] should be contacted to determine any possible gang affiliation.[50] On or about August 9, 2004, Sgt. Gamaliel Olvera, of the McConnell Unit STG office wrote that Plaintiff was not being monitored by their office and that they had not received any information which may indicated that Plaintiff's safety was at risk.[51]

The next day, August 10, 2004, the McConnell Unit UCC met to review Plaintiff's "life in danger" claim.[52] A UCC is made up of three voting members: a chairperson, a unit security representative, and a person from the unit's treatment team, who review and make recommendations

---

[48] *Id*, pg. 6

[49] *Id.*, pg. 6

[50] *Id.*, pg. 6-7

[51] *Id.*, pg. 10

[52] *Id.*, pgs. 11-12

regarding an offender's custodial classification while at the unit.[53]  No single individual at the unit, including the Senior Warden, Duty Warden or the Assistant Warden, has the authority to change the custodial classification of an offender.  A recommendation to change an offender's classification requires a majority vote by the UCC.[54]  The SCC in Huntsville in the final approving authority on all recommendations.[55]  This procedure is in compliance with the Safe Prisons Plan and Classification Plan.

The UCC reviewing Plaintiff's life endangerment claim was comprised of: Major Domingo Carillo, Jorge Veliz, and Amie Gaitan.[56]  Defendant Kennedy was not a member.  The UCC determined that there was no evidence to warrant a unit transfer for Plaintiff and noted that Plaintiff had signed the offender waiver statement and stated that he was "not having problems."[57]  On or about the same date, Plaintiff job assignment was changed from the Garden Squad to the Laundry.[58]

The issue of Plaintiff's safety was not raised again until the March 19, 2005, altercation between Plaintiff and Inmate Anthony Hampton, TDCJ-ID# 668364.  Nor is there any evidence that from August 10, 2004 to March 19, 2005, that Plaintiff filed any I-60 Inmate Correspondence to Officials.[59]  Nor is there any evidence that Plaintiff filed any Step 1 or Step 2 Offender Grievance Forms complaining about the results of UCC hearing in August, or of any misconduct on behalf of

---

[53] Exhibit D, pgs. 2-3

[54] Id., pg. 3

[55] Exhibit E, pgs. 9-10

[56] Exhibit A, pg. 11

[57] Id., pgs. 11-12

[58] Id., pg. 12

[59] Exhibit C

Defendant Kennedy.[60]  Defendant Kennedy has no recollection of having any conversation regarding a life endangerment concern by Plaintiff, and if such a conversation had taken place, Defendant Kennedy would have followed appropriate TDCJ procedure and referred the matter to the Unit Classification Chief or other security officer.[61]

In fact, Warden Kennedy's involvement did not take place until March 19, 2005, when she was informed of the altercation between Plaintiff and Offender Hampton.[62]  Subsequently, on March 30, 2005, she reviewed the Administrative Incident Review sent to the Emergency Action Center by Senior Warden Loyd Massey on March 30, 2005.[63]

As stated previously, personal involvement in the alleged constitutional deprivation is an essential element of a civil rights cause of action.[64]  The person to be held liable for a constitutional deprivation must have either directly or indirectly subjected some other person to a constitutional deprivation while acting under color of state law.  Competent summary judgment evidence shows that: (1)  Defendant Kennedy was not present Plaintiff's August 10, 2004, UCC hearing which denied his life endangerment claim; (2) Plaintiff did not submit any I-60s  for the time period of August 10, 2004 to March 19, 2005; (3) Plaintiff did not submit a Step 1 or 2 Offender Grievance Form complaining of the result of the UCC hearing on his life endangerment claim in August 2004 or of any misconduct on behalf of Defendant Kennedy; and (4) Plaintiff did not speak personally to

---

[60] Affidavit, Randy Minter

[61] Affidavit, Eileen Kennedy

[62] Exhibit A, pgs. 23; Exhibit B

[63] Exhibit B

[64] *Thompson v. Steele*, 709 F.2d 381, 832 (5th Cir. 1983).

Defendant Kennedy about a life endangerment concern, or if he had, Defendant Kennedy would have followed TDCJ-ID procedures. Based on the foregoing evidence, Plaintiff's failure to protect claim against Defendant Kennedy should be denied. Consequently, Defendant Kennedy is entitled to judgment as a matter of law.

**C.    *Plaintiff Has Failed To Establish Deliberate Indifference Under The 8th Amendment***

It is well settled that the Eighth Amendment's proscription against cruel and unusual punishment affords inmates a measure of protection from violent attacks by other inmates.[65] However, to establish a failure to protect claim under § 1983, Plaintiff must show that he was incarcerated under conditions that posed a substantial risk of serious harm to his safety and that the Defendant was deliberately indifferent to his need for protection.[66] To act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[67]

Prison officials are not liable for failure to protect if (1) "they were unaware of even an obvious risk to inmate health or safety;" (2) "they did not know of the underlying facts indicating a sufficiently substantial danger;"(3) "they knew of the underlying facts but believed (albeit unsoudly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (4) "they knew of a substantial risk to inmate health or safety ... [and] responded reasonably to the danger, even if the harm was not ultimately averted."[68]

---

[65] *Smith v. Wade*, 461 U.S. 30, 130 S.Ct. 1625 (1983).

[66] *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994).

[67] *Id*, 114 S.Ct. At 1979.

[68] *Id,* 511 U.S. at 844-45.

In the present instance, competent summary judgment evidence shows that Defendant Kennedy was unaware of a risk to Plaintiff's health and safety until March 19, 2005, when she was informed of the altercation between Plaintiff and Offender Hampton, and when she subsequently reviewed the Administrative Incident Review sent to the TDCJ-ID Emergency Action Center by Senior Warden Loyd Massey.[69] [70]  There is no evidence that from August 10, 2004, to March 19, 2005, Plaintiff filed any I-60 Inmate Correspondence to Officials.[71]  Nor is there any evidence that Plaintiff filed a Step1 or 2 Offender Grievance Form regarding the decision of the UCC on Plaintiff's life endangerment claim in August 2004[72] or of any misconduct on behalf of Defendant Kennedy.[73] Defendant Kennedy has no recollection of having any conversation regarding a life endangerment concern by Plaintiff, and if such a conversation had taken place, Defendant Kennedy would have followed appropriate TDCJ procedure and referred the matter to the Unit Classification Chief or other security officer.[74]

Based on the summary judgment evidence, Plaintiff has failed to show that Defendant Kennedy acted with deliberate indifference to his safety.  Defendant Kenney is entitled to judgment as a matter of law.

---

[69] Exhibit A, pg. 23; Exhibit B

[70] Exhibit B

[71] Affidavit, Randy  Minter

[72] Exhibit C

[73] *Id.*

[74] Affidavit, Eileen Kennedy

**D.      Defendant Kennedy is entitled to official immunity.**

To the extent Plaintiff is suing Defendant Kennedy in her official capacity for money damages,  Defendant is entitled to Eleventh Amendment immunity.  Unless a State consents to suit or Congress exercises its power to override a State's immunity, the Eleventh Amendment to the United States Constitution bars suits against a State in federal court.[75]  It has been held that States are not subject to § 1983 suits in either state or federal courts and that when a suit is brought against a state official in his official capacity, the claims are, in effect, asserted against the State itself.[76]

Additionally, the Fifth Circuit established that while a state official's future conduct may be subject to an injunction, a federal court may not award monetary damages against a state official.[77]  Finally, the court has repeatedly held that the Eleventh Amendment bars plaintiffs from recovering monetary damages in § 1983 claims from state officials in their official capacities.[78]

To the extent that this claim is brought against Defendant Kenney in her official capacity for money damages, it is barred by the Eleventh Amendment to the United States constitution.  Thus, the Plaintiff has failed to state a § 1983 claim for money damages against Defendant Kennedy in her official capacity.  Accordingly, Plaintiff's claim for monetary damages against Defendant in her official capacity should be dismissed.

---

[75] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989).

[76] *Id.*, 491 U.S. at 71.

[77] *Saahir v. Estelle*, 47 F.3d 758, 762 (5th Cir. 1995).

[78] *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

**E.      Defendant Kennedy is entitled to qualified immunity.**

The necessity for a qualified immunity defense reflects an attempt to balance the competing interests of "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."[79]  Generally, government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known.[80] That is, their actions are reasonable in light of current American law.[81]

Because the doctrine of qualified immunity is "designed to protect public officials from the 'broad ranging discovery' that can be 'peculiarly disruptive of effective government,' questions regarding qualified immunity are resolved on the face of the pleadings and with limited resort to pre-trial discovery."[82] If upon viewing the evidence in the light most favorable to the non-movant, reasonable public officials could differ on the lawfulness of the Defendant's actions, the Defendant is entitled to qualified immunity.[83]  Once a government official has asserted qualified immunity, the burden shifts to the Plaintiff to show that qualified immunity does not bar recovery.[84]

---

[79] *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982).

[80] *Id.*, 457 U.S. at  818.

[81] *Anderson v. Creighton,* 483 U.S. 635, 645, 107 S.Ct. 3034 (1987) .

[82] *James v. Sadler*, 909 F.2d 834, 838 (1994) *citing Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3042 (1987).

[83] *Harper v. Harris County*, 21 F.3d 597, 600 (1994).

[84] *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). *See also McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

The defense of qualified immunity has both an objective and subjective component.[85]  The objective component requires a presumptive knowledge of and respect for basic, unquestioned constitutional rights.[86]  The subjective component consists of permissible intentions.[87]  When confronted with the defense of qualified immunity, the court must proceed with a two-step analysis:

> (1)    Determine whether the Plaintiff has alleged a deprivation of a clearly established constitutional right, and if so
>
> (2)    Determine whether the Defendant's response was objectively unreasonable.[88]

Should the court reach the second step, "objective unreasonableness,"  there is yet another two-prong inquiry.  First, determine whether the right was clearly established at the time of the alleged violation.[89]  "Clearly established" for the purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.[90]  Second, determine whether the Defendant's conduct was objectively unreasonable in light of that then clearly established law.[91]  The appropriate question to ask in the

---

[85] *Harlow*, 457 U.S. at 815.

[86] *Id.*, 457 U.S. at  815.

[87] *Id.*, 457 U.S. at  815.

[88] *Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999) citing *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998). *Sir Williams v. Bramer*, 180 F.3d 699, 702-703 (5th Cir. 1999).

[89] *Hare*, 135 F.3d at 326.

[90] *Wilson v. Layne,* 526 U.S. 603, 614-615,  119 S.Ct. 1692 (1999).

[91] *Id.,* at 326.

subject cause is whether a reasonable officer could have believed that Defendant Kennedy actions were lawful, in light of clearly established law and the information Defendant Kennedy possessed.

In this case, Plaintiff failed to create a fact question over whether Defendant Kennedy's conduct violated Plaintiff's constitutional rights or whether Defendant Kennedy's conduct was objectively unreasonable.  As a result, Defendant Kennedy is entitled to qualified immunity.

## VI.
## CONCLUSION

**WHEREFORE, PREMISES CONSIDERED**, Defendant Eileen Kennedy respectfully prays that this Court grant her Motion For Summary Judgment, dismissing all of Plaintiff's claims against her in their entirety; and that the Court enter such other and further relief as warranted.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

EDWARD D. BURBACH
Deputy Attorney General for Litigation

DAVID A. TALBOT, JR.
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ Carol M. Garcia
CAROL M. GARCIA
Assistant Attorney General
Attorney-In-Charge
State Bar No. 07631680
Southern ID No. 14338

P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone (512) 463-2080
Fax No. (512) 495-9139

**ATTORNEYS FOR DEFENDANT
EILEEN KENNEDY**

**NOTICE OF ELECTRONIC FILING**

I, **CAROL M. GARCIA**, Assistant General of Texas, do hereby certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing **Defendant Eileen Kennedy's Motion For Summary Judgment And Brief In Support** in accordance with the Electronic Case Files System of the Southern District of Texas, on the 20th day of September, 2006.

/s/ Carol M. Garcia
**CAROL M. GARCIA**
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I, CAROL M. GARCIA Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Eileen Kennedy's Motion For Summary Judgment And Brief In Support** has been served by placing same in the United State Mail, on this the 20th day of September, 2006 addressed to:

Aundrea E. Mathis, Sr., TDCJ-CID# 583934          *Via CM/RRR No. 7004 0750 0000 6765 1996*
Coffield Unit
Rt. 1, Box 150
Tennessee Colony, Texas 75884

/s/ Carol M. Garcia
CAROL M. GARCIA
Assistant Attorney General